EDITH MEYER RANNEY, EDWARD H. HOBBIE, JR., AND BERYL HOBBIE, HIS WIFE, ADOLPH KALIN AND ETHEL S. KALIN, HIS WIFE, AND SAMUEL TUFTS, PLAINTIFFS-APPELLANTS, v. ISTITUTO PONTIFICIO DELLE MAESTRE FILIPPINI, A CORPORATION OF THE STATE OF NEW JERSEY NOT INCORPORATED FOR PECUNIARY PROFIT, THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MORRIS, THE BOARD OF ADJUSTMENT OF THE TOWNSHIP OF MORRIS, AND FARQUHAR M. FRASER, BUILDING INSPECTOR OF THE TOWNSHIP OF MORRIS, DEFENDANTS-RESPONDENTS.

Argued November 7, 1955—Decided December 12, 1955.

*Mr. Worrall F. Mountain, Jr.,* argued the cause for the plaintiffs-appellants (*Messrs. Mills, Jeffers & Mountain,* attorneys).

*Mr. Ralph Porzio* argued the cause for the defendant-respondent Istituto Pontificio Delle Maestre Filippini (*Messrs. Scerbo, Porzio & Kennelly,* attorneys).

*Messrs. Mills & Mills,* attorneys for defendants-respondents Township Committee of the Township of Morris, The Board of Adjustment of The Township of Morris, and Farquhar M. Fraser, Building Inspector of The Township of Morris (no brief filed and no oral argument made).

The opinion of the court was delivered by

BURLING, J. Plaintiffs-appellants challenged the validity of a zoning variance granted to the defendant-respondent Istituto Pontificio Delle Maestre Filippini, generally known and hereinafter referred to as "Villa Walsh," and from an adverse determination in the Superior Court, Law Division, addressed an appeal to the Superior Court, Appellate Division. We certified the cause prior to an appellate review below.

Villa Walsh, a non-profit corporation of this State, is an educational institution engaged in the training of teachers for parochial schools throughout New Jersey. It is the owner of a 100-acre tract of land in the general area of Western Avenue and Pickatinny Road in Morris Township, County of Morris, upon which its present physical facilities are located. The present use was initiated prior to the passage of the 1932 zoning ordinance of Morris Township which placed the area within a large "A" residence zone. By virtue of the classification the use was rendered nonconforming and has continued in this status.

In 1952 Villa Walsh desired to expand its facilities and accordingly applied to the building inspector of Morris Township for permission to erect a new building. The proposed structure would enable an increased school enrollment by containing additional living accommodations, and would include an auditorium as well as study, conference and recreational rooms. Although there is some dispute as to the height of the building, the design is of substantial proportion. An elevated passageway would connect the new building with one of the existing structures.

The building inspector denied the application in view of section VIII (a) of the Morris Township Zoning Ordinance which provides:

"Any non-conforming use or structure existing at the time of the passage of this ordinance may be continued upon the lot or in the building so occupied, and any such structure may be restored or repaired in the event of partial destruction thereof but no such use or structure may be enlarged."

Thereafter Villa Walsh sought a variance from the terms of the ordinance by addressing the Board of Adjustment and the Township Committee of Morris County pursuant to the recommendatory procedure of *N. J. S. A.* 40:55-39(*d*). Three separate hearings were held by the board of adjustment during February and March of 1953 and were attended by representatives of Villa Walsh and certain of the parties plaintiff together with other owners of property in the immediate area. The prime concern of the latter group was that the expansion would constitute an opening wedge for further growth which might, in time, substantially alter the residential characteristics of the area. Their desire was to maintain the *status quo*. There was evidence of heavy Sunday traffic moving to and from Villa Walsh, especially during the summer months, which would be augmented through an increased enrollment. Some complaint was made that students and visitors were accustomed to strolling on adjacent residential properties but the representatives of the school assured there would be orders restricting its personnel and guests to the premises. One resident favored the variance, indicating that the increase in personnel would make no change in the present conditions.

The board recommended the variance to the township committee without dissent and the governing body approved by concurring resolution.

On April 2, 1953 plaintiffs proceeded by complaint in lieu of prerogative writ in the Superior Court, Law Division, challenging the action of the township authorities. The case was abruptly terminated by consent of counsel and the lower

court and the resolutions of the board of adjustment and township committee set aside for lack of jurisdictional findings of fact. The judgment directed remand for a reconsideration of the evidence previously submitted and ordered the township bodies to embody a definitive recitation of jurisdictional facts within their resolutions should the variance be approved.

The board of adjustment, following reargument and reappraisal of the evidence, adopted a resolution recommending the variance requested by Villa Walsh on February 2, 1954. On February 26 the township committee adopted a concurring resolution. Plaintiffs filed a supplemental complaint on March 10, 1954, and answer thereto was made by Villa Walsh and the township authorities, and the cause proceeded upon the merits in the Superior Court, Law Division.

The recitation of the basic jurisdictional facts in the resolution of the board of adjustment is inclusive of the recital in the township committee resolution and may be briefly summarized: the existing facilities of Villa Walsh are inadequate to its present program in training teachers and also in providing comfortable living space for its inhabitants; the premises are not adaptable for the construction of single-family residences "by reason of its unusual topography and the existence of a large brick mansion, a chapel and two dormitory and classroom buildings"; removal of the existing facilities to accommodate permissible uses would work a severe financial hardship, as would a relocation of the school; the variance "would not affect the present character of the surrounding property" nor would it result in "substantial detriment to the public good" nor "impair the intent and purpose of the zoning ordinance."

The trial court upheld the grant of the variance, deeming the reasons given to justify its issuance within the statutory ambit and consistent with the objects of zoning.

Plaintiffs' attack and argument take the following design: The variance is not justified under the requirements of *N. J. S. A.* 40:55–39 (*d*) for it does not subserve any of the purposes of zoning; the resolution of the township committee

is void because an "independent investigation was undertaken and not disclosed on the record."

The factual situation and circumstance present an appealing case. The salutary motivation of Villa Walsh in seeking to increase its facilities and thus to train more teachers to meet the educational needs of the parochial schools and children of this State is commendable. The problems attendant upon realizing this goal must nevertheless be recognized for what they are, and as presented in this case call for the extension and enlargement of a use which has been non-conforming since the passage of the Morris Township zoning ordinance in 1932. *Cf. Yanow v. Seven Oaks Park, Inc.*, 11 *N. J.* 341 (1953).

In its historical inception the non-conforming use was considered a necessary adjunct to any comprehensive zoning plan. Proponents of zoning were conscious of the severe hardship which might be placed upon the owner of developed property should a uniform use scheme be suddenly impressed upon a diversified area, working a peremptory cessation of existing uses not in conformance with the plan. The principle has been concisely stated by the New York Court of Appeals in *People v. Miller*, 304 *N. Y.* 105, 108, 106 *N. E. 2d* 34, 35 (*Ct. App.* 1952):

"The destruction of substantial businesses or structures developed or built prior to the adoption of a zoning ordinance is not deemed to be balanced or justified by the advantage to the public, in terms of more complete and effective zoning, accruing from the cessation of such uses."

See *Frank J. Durkin Lumber Co. v. Fitzsimmons*, 106 *N. J. L.* 183 (*E. & A.* 1929); 1 *Yokely, Zoning Law & Practice* (1953), *sec.* 147. The constitutional protection of due process proved to be the legal obstacle. See *Jones v. City of Los Angeles*, 211 *Cal.* 304, 295 *P.* 14 (*Sup. Ct.* 1931). To accommodate this otherwise arbitrary feature of zoning the legislative design, at least in New Jersey, has been to afford protection to non-conforming uses. *R. S.* 40:55–48 provides:

"Any nonconforming use or structure existing at the time of the passage of an ordinance may be continued upon the lot or in the building so occupied and any such structure may be restored or repaired in the event of partial destruction thereof."

█ While the courts have given full accord to this statutory mandate, *United Advertising Corp. v. Borough of Raritan,* 11 *N. J.* 144, 152 (1952); *Frank J. Durkin Lumber Co. v. Fitzsimmons, supra; Kramer v. Town of Montclair,* 33 *N. J. Super.* 16 *(App. Div.* 1954), the spirit of the law is to restrict non-conforming uses. *Monmouth Lumber Co. v. Ocean Township,* 9 *N. J.* 64, 77 (1952); *Speakman v. Mayor and Council of Borough of North Plainfield,* 8 *N. J.* 250, 257 (1951); *Lumund v. Board of Adjustment,* 4 *N. J.* 577, 585 (1950). Their position in the zoning scheme is not encouraged because of the tendency to subvert rather than support sound planning. Such uses possess a contagious character which works to infect the neighborhood of their location, *Beirn v. Morris,* 14 *N. J.* 529, 536 (1954); Note, 9 *U. of Chicaga L. Rev.* 477, 479, 480 (1942), and their presence is adverse to the zoning objective of reasonable conformity, *Speakman v. Mayor and Council of Borough of North Plainfield, supra,* 8 *N. J.,* at *page* 257. One eminent authority has gone so far as to suggest that the entire problem of the non-conforming use might be solved by establishing a duty to abstain from unfair non-conformity. See *Freund, Some Inadequately Discussed problems of the Law of Zoning and City Planning,* 24 *Ill. L. Rev.* 135, 147 (1929). Without discussing the merits of this proposition it is sufficient to remember that the benefits which accrue to the public through the zoning method are accompanied by burdens to all, *Schmidt v. Board of Adjustment,* 9 *N. J.* 405, 415 (1952).

██ Two philosophies have been advanced concerning the nature of the burden which the non-conforming owner is to contribute to the public benefit derived from zoning where a restriction against enlargement of the use or structure, similar to that contained in section VIII of the Morris Township ordinance, *supra,* appears. One approach recognizes the right of the non-conforming user to expand its

operation or facilities to the boundaries of the property existing at the time of the passage of the zoning ordinance. *In re Gilfillan's Permit*, 291 *Pa.* 358, 140 *A.* 136 (*Sup. Ct.* 1927). We have adopted a more strict interpretation of *R. S.* 40:55–48 and municipal enactments pursuant thereto, and a view which we believe consonant with the spirit of zoning. *Bassett, Zoning* (*2nd ed.* 1940), 109. In *DeVito v. Pearsall*, 115 *N. J. L.* 323 (*Sup. Ct.* 1935), the prosecutor sought a building permit to erect a much larger greenhouse upon his property, which was a non-conforming use under the zoning ordinance. Mr. Justice Case rejected the doctrine of natural expansion urged by the prosecutor. So, in *Monmouth Lumber Co. v. Ocean Township*, 9 *N. J.* 64 (1952), we upheld the action of the municipal governing body in rejecting the recommendation of the board of adjustment under *N. J. S. A.* 40:55–39(*d*) to grant plaintiff a variance for the purpose of building a garage to house its trucks, which would have constituted an enlargement of the non-conforming use. Cases displaying an equally vigorous application of this concept are too numerous to seriously question the New Jersey position: *Burmore Co. v. Smith*, 124 *N. J. L.* 541 (*E. & A.* 1940); *Gross v. Allan*, 37 *N. J. Super.* 262 (*App. Div.* 1955); *Hay v. Board of Adjustment of Fort Lee*, 37 *N. J. Super.* 461 (*App. Div.* 1955); *Martin v. Cestone*, 33 *N. J. Super.* 267 (*App. Div.* 1954); *Rockleigh Borough v. Astral Industries, Inc.*, 29 *N. J. Super.* 154 (*App. Div.* 1953); *Home Fuel Oil Co. v. Board of Adjustment of Borough of Glen Rock*, 5 *N. J. Super.* 63 (*App. Div.* 1949); *National Lumber Products Co. v. Ponzio*, 133 *N. J. L.* 95 (*Sup. Ct.* 1945); and see Editorial Note, 9 *Rutgers L. Rev.* 697, 706 (1955); Note, 102 *U. of Pa. L. Rev.* 91, 98 (1953). The criterion of determination is the use of the property at the time the zoning ordinance was enacted. It must be the same both before and after the passage of the ordinance, *Burmore Co. v. Smith, supra; Gross v. Allan, supra; National Lumber Products Co. v. Ponzio, supra.* This represents the interpretation to be attached to *R. S.* 40:55–48. That which is clearly implied from the purpose which under-

lies a statute is as much a part of the law as that which is expressed. *Brandon v. Board of Commissioners of Town of Montclair,* 124 *N. J. L.* 135, 143 (*Sup. Ct.* 1940), affirmed 125 *N. J. L.* 367 (*E. & A.* 1940).

Villa Walsh cites instances wherein variances have been upheld permitting the creation of a non-conforming use in an area zoned against such use. Based upon such precedent it is argued that the enlargement of a non-conforming use presents an *a fortiori* case, and especially where "eleemosynary institutions" which "serve vital public purposes in our society" are concerned. It is said by Villa Walsh that "we are dealing with subsection (d) of the statute * * * we have numerous special reasons required by the statute * * * the furtherance of the general walfare and the advancement of numerous public purposes for which this section of the statute was intended to foster." "There is competent authority that uses of property designed for public convenience and welfare, such as educational and religious uses, can be made the subjects of proper exceptions to zoning regulations."

 The thesis of this argument finds its basis upon an interpretation of *Ward v. Scott,* 11 *N. J.* 117 (1952), which interpretation we conceive to be erroneous. We held that the undue hardship requirement of *N. J. S. A.* 40:55–39(c) was not a part of subsection (d); that subsection (d) was nevertheless sufficiently fitted with standards to withstand an attack upon its constitutionality; that the purposes of zoning as declared in *R. S.* 40:55–32 taken together with the concluding proviso of *N. J. S. A.* 40:55–39 constituted a sufficient guidepost for the recommendatory variance procedure under subsection (d). The variance cannot issue where it will result in substantial detriment to the public good or work to undermine the intent and purpose of the zoning plan. *N. J. S. A.* 40:55–39(d). See *Rexon v. Board of Adjustment of Borough of Haddonfield,* 10 *N. J.* 1 (1952). It is not the understanding of this court that *N. J. S. A.* 40:55–39(d) was ever intended by the Legislature to encompass what is known in zoning law as an "exception." *Cf. N. J. S. A.* 40:55–39(b); *R. S.* 40:55–36 prior to amend-

ment by *L.* 1948, *c.* 305. Exceptions fulfill the practical recognition that certain uses of property are compatible with the essential design of a particular zone although the use is contrary to the restrictions imposed thereon. *Montgomery County v. Merlands Club,* 202 *Md.* 279, 96 *A.* 2*d* 261 (*Ct. App.* 1953). The exception procedure is safeguarded by standards set forth in the ordinance. See 1 *Yokely on Zoning* (1953), *sec.* 133; 8 *McQuillin on Municipal Corporations* (1950), *sec.* 25.160. The zoning ordinance of Morris Township contains no authorization for the granting of exceptions. See *Norton, Elimination of Incompatible Uses and Structures,* 20 *Law and Contemporary Problems* 313 (1955).

Villa Walsh seeks to demonstrate "special reasons" which inhere in its property by pointing to evidence presented to the Board of Adjustment that the proposed building site was unsuited for the construction of residential homes because of topographical restrictions and the immediacy of the present physical plant of the school. It states that to require the removal of the present facilities to render the area available for permissible uses would work a severe financial hardship.

██ For the purposes of argument this may be conceded. It is not shown, however, that the entire tract of 100 acres is similarly afflicted, and the argument overlooks the fact that the present use and structures need not be abandoned. Financial hardship would only be self-inflicted for *R. S.* 40:55–48 obviates any such hardship. The record does not support the finding that the variance may be granted "without substantial detriment to the public good" which "will not substantially impair the intent and purpose of the zone plan and zoning ordinance," *N. J. S. A.* 40:55–39(*d*), despite the recitation to that effect in the resolutions of the township bodies. The existing use and structure cannot justify an enlargement in the face of a zoning plan which has prescribed and fostered the overwhelmingly residential character of the area in which Villa Walsh is located. *Monmouth Lumber Co. v. Ocean Township, supra; Stolz v.*

*Ellenstein, 7 N. J.* 291 (1951); *Rockleigh Borough v. Astral Industries, Inc., supra.* A variance here would be directly antagonistic to the design and purpose of the ordinance and sound zoning. The "disintegrating process would be set in motion," *Beirn v. Morris, supra.* "The zoning act does not contemplate variations which would frustrate the general regulations and impair the overall scheme which is set up for the general welfare of the several districts and the entire community," *Dolan v. DeCapua,* 16 *N. J.* 599, 611 (1954). In *Speakman v. Mayor and Council of Borough of North Plainfield, supra,* we stated (8 *N. J.,* at *pages* 257–258):

> "Moreover, a board of adjustment, when acting in such matters, is governed by the spirit of the Zoning Act which 'has been to restrict rather than to increase non-conforming uses, and authority to vary the application of the general regulation should be sparingly exercised.' *Lumund v. Board of Adjustment of the Borough of Rutherford,* 4 *N. J.* 577, [584] 585 (1950). 'A pre-existing non-conforming use may not be enlarged or radically modified simply because the new use would be "no more harmful" than the old to the adjacent landowners.' "

This court has not been called upon to determine the effect of the 1953 amendment (*L.* 1953, *c.* 288) of *N. J. S. A.* 40:55–39(c), if any, upon subsection (d) since its effective date of July 27, 1953. We have previously noted, however, that the amendment is restrictive in character, *Ward v. Scott,* 16 *N. J.* 16, 18 (1954); *Biern v. Morris,* 14 *N. J.* 529, 537 (1954), for it prohibits the board of adjustment *per se* (without reference to the governing body) from granting a variance in a district restricted against such proposed use. It is sufficient to state that the decision here rests upon the general proviso of *N. J. S. A.* 40:55–39 that a variance must not issue where it will substantially thwart the zoning plan as hereinbefore demonstrated.

█ Plaintiffs also attacked the resolution of the township committee. The resolution states that the committee "made an independent investigation of the application." It is contended that without specifying the nature and import of the procedure taken the entire findings are void. *Giordano v.*

*City Commission of City of Newark,* 2 *N. J.* 585 (1949). The resolution as a whole indicates that the governing body was fully cognizant of the terms of the judgment previously entered directing the recitation of jurisdictional findings of fact based upon the same evidence and we find no irregularities in this respect. *Cf. Monmouth Lumber Co. v. Ocean Township, supra.*

The determination below is reversed and the cause remanded for entry of judgment in accordance with this opinion.

JACOBS, J., with whom WILLIAM J. BRENNAN, JR., J., joins (dissenting). The Villa Walsh is an attractive Catholic school located amidst the rolling hills of Morris Township and operated under supervision of the State Department of Education. It is ideally situated on an elevated 100-acre tract and its cluster of buildings is hardly visible from the distant homes of the townspeople. Two years after it was established it was placed in a residential zone by the township's zoning ordinance of 1932 and although its use thus became a non-conforming one, it remained wholly compatible with the existing surroundings. With the passage of time its facilities became inadequate to meet its needs and it sought to modernize and moderately enlarge them by the construction of an additional building. Application for the necessary variance was approved by the local board of adjustment and the township committee and sustained by Judge Speakman in the Law Division. In striking down their concordant action, the majority not only reaches an unwarranted result but does so in an opinion embracing inflexible principles which ignore the clear statutory language embodied in *N. J. S. A.* 40:55–39(*d*). The suggestion may be ventured that, if the course now being taken is actually pursued in later instances, it will retard rather than advance the true interests of the proponents of fair and decent zoning throughout the State.

Some students of the subject have expressed the view that while municipalities are properly vested with broad zoning

powers they should not have authority to grant individual variances; their position seems to be that variances necessarily tend to destroy the basic zoning structure and should therefore not be tolerated at all. Equally conscientious students believe that, in order to take care of special situations and to enable the correction of individual injustices, municipalities should have authority to grant reasonable variances which are in furtherance of the statutory objectives and do not substantially impair the zoning plan; their position seems to be that if no such safety valve is available, the cumulative effects of the rigid zoning barriers and the continuing individual injustices will ultimately tend to bring about, through democratic processes, the very destruction of the wholesome aspects of the basic zoning structure. Admittedly the choice of approach is with the legislative branch of government and our Legislature has, in unmistakable language, aligned itself with those who believe that a municipal zoning plan is strengthened rather than weakened by the presence of a properly circumscribed and controlled variance power. See *N. J. S. A.* 40:55–39(*d*) ; *Ward v. Scott (I)*, 11 *N. J.* 117 (1952); *Ward v. Scott (II)*, 16 *N. J.* 16 (1954).

When the Zoning Act of 1928 was passed (*L.* 1928, *c.* 274) it contained a paragraph which authorized the board of adjustment itself to grant a variance upon a specified showing and a separate paragraph which simply authorized the board of adjustment to recommend action by the municipal governing body. The former paragraph became *R. S.* 40:55–39(*c*) and the latter became *R. S.* 40:55–39(*d*). In 1948 and 1949 there were legislative amendments which apparently narrowed paragraph (c) but broadened paragraph (d). See *L.* 1948, *c.* 305 and *L.* 1949, *c.* 242. Under the 1949 amendment of paragraph (d) the board of adjustment was authorized to recommend "in particular cases and for special reasons" the granting of a variance to allow a structure or use in a district restricted against such structure or use, and the governing body was authorized to approve or disapprove the recommendation and in the event of approval

the permit for the structure or use was to issue. In *Monmouth Lumber Co. v. Ocean Township*, 9 *N. J.* 64 (1952), this court held that paragraph (d) meant exactly what it said and that there was no justification for judicial importation of the requirements of paragraph (c) into paragraph (d). In *Ward v. Scott* (*I*), 11 *N. J.* 117 (1952), the court reaffirmed the meaning and effect of paragraph (d) as set forth in the *Monmouth* case and rejected the contention that it failed to embody sufficient standards; it noted particularly that *R. S.* 40:55–32 contains an adequate statement as to proper zoning objectives, including the promotion of "health, morals or the general welfare," and that *N. J. S. A.* 40:55–39 contains an express provision against allowance of the variance unless it can be granted "without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance."

After the clear holding in *Ward v. Scott* (*I*), *supra*, the Legislature again amended *N. J. S. A.* 40:55–39; it further narrowed paragraph (c) but reenacted paragraph (d) without any change whatever. See *L.* 1953, *c.* 288. On several recent occasions the lower courts have applied the terms of paragraph (d), rejecting some proposed variances but sustaining others within *Ward v. Scott, supra. Cf. Izenberg v. Board of Adjustment of City of Paterson*, 35 *N. J. Super.* 583 (*App. Div.* 1955) with *Moriarty v. Pozner*, 36 *N. J. Super.* 586 (*App. Div.* 1955), certification granted 19 *N. J.* 620 (1955). In *Ward v. Scott* (*II*), *supra*, this court passed finally upon the variance which the Town Council of Bloomfield, acting pursuant to a recommendation of the local board of adjustment under *N. J. S. A.* 40:55–39(*d*), had granted to enable the construction of a retail shopping center on land which had been zoned in part for residential purposes. In refusing to set aside the variance, the court expressed the following views which, if applied here, would remove all doubts as to the soundness of the Law Division's determination in the instant matter:

"Earlier judicial views have been displaced by recent cases in this court which hold that municipal governing bodies may exercise

broad powers in their zoning regulation of land and structures. See *Fischer v. Township of Bedminster*, 11 N. J. 194, 201 (1952); *Lionshead Lake, Inc., v. Township of Wayne*, 10 N. J. 165 (1952), appeal dismissed 344 U. S. 919, 73 S. Ct. 386, 97 L. Ed. 708 (1953); *Duffcon Concrete Products v. Borough of Cresskill*, 1 N. J. 509 (1949). Although these cases have been the subject of varying comments, we are convinced that they are in furtherance of constitutional and statutory objectives and the public welfare generally. Cf. Haar, *Zoning for Minimum Standards: The Wayne Township Case*, 66 Harv. L. Rev. 1051 (1953), with Nolan and Horack, *How Small a House?—Zoning for Minimum Space Requirements*, 67 Harv. L. Rev. 967 (1954). See 4 Rutgers L. Rev. 71 (1950); 6 Rutgers L. Rev. 93 (1951); 7 Rutgers L. Rev. 85 (1952); 8 Rutgers L. Rev. 73 (1953). But we are equally convinced that the sanctioning of far-reaching zoning restrictions must fairly be accompanied by sympathetic recognition that there will arise, from time to time, exceptional situations which will justly call for individual variances within the prescribed legislative conditions and standards. See N. J. S. A. 40:55–39; *Ward v. Scott*, 11 N. J. 117, 122 (1952). Local officials who are thoroughly familiar with their community's characteristics and interests and are the proper representatives of its people are undoubtedly the best equipped to pass initially on such applications for variance. And their determinations should not be approached with a general feeling of suspicion, for as Justice Holmes has properly admonished: 'Universal distrust creates universal incompetence.' *Graham v. United States*, 231 U. S. 474, 480, 34 S. Ct. 148, 151, 58 L. Ed. 319, 324 (1913). Where, as here, the application for variance has been given careful and conscientious consideration by the zoning board and the town council and has been acted upon by both of them in strict conformity with the procedural and substantive terms of the statute, the ultimate interests of effective zoning will be advanced by permitting the action of the municipal officials to stand, in the absence of an affirmative showing that it was manifestly in abuse of their discretionary authority. Cf. *Cobble Close Farm v. Bd. of Adjustment, Middletown Tp.*, 10 N. J. 442, 453 (1952); *Schmidt v. Board of Adjustment of City of Newark, supra*. We are satisfied that there was no such showing in the instant matter."

It seems to me that the considerations favoring the variance sought by Villa Walsh are infinitely more compelling than those presented in *Ward v. Scott, supra*. In contrast to the private business use there involved, the institutional use here is wholly compatible with the residential area. Many states take the position that churches and schools are not hostile to residential areas but, on the contrary, rightly belong there. See *Yokely, Zoning Law and Practice* (1953),

§§ 222, 247. *Cf. O'Brien v. City of Chicago*, 347 *Ill. App.* 45, 105 *N. E. 2d* 917, 920 (1952) ; *Livingston v. Davis*, 243 *Iowa* 21, 50 *N. W. 2d* 592, 597, 27 *A. L. R. 2d* 1237 (1951). It is worthy of note that the township's ordinance of 1932 expressly permits churches in residential zones, along with other designated uses such as professional offices and boarding and rooming houses, but makes no specific reference to schools. Villa Walsh, like most of the schools for advanced learning in our State, may well be viewed as a public asset rather than a liability to its residential surroundings; it may be wondered whether the court would feel equally compelled to strike down a variance under paragraph (d), if it became necessary to enable reasonable modernization or enlargement of a university building operated in a residential zone by Princeton, Rutgers, Seton Hall or other established university in the State. Compare *Lumpkin v. Township Committee of Bernards*, 134 *N. J. L.* 428 (*Sup. Ct.* 1946), where the municipal board of adjustment recommended an exception or variance under *R. S.* 40:55–39(*d*) to enable the construction of a nonsectarian boarding school for boys in a residential zone where churches and church schools were permitted; the board expressed the view that " 'the establishment of the school would render a service to the community and would not injuriously affect the rights of adjoining property owners nor be contrary to the public interest.' " Although the municipal governing body had declined to approve the recommendation, the former Supreme Court summarily set aside the refusal as shocking " 'to reason and to justice.' "

In further contrast to the circumstances presented in *Ward v. Scott, supra,* there are no residents near Villa Walsh who may fairly say that the proposed construction will have any substantially adverse effects upon them or their homes. The majority opinion suggests that the Sunday traffic to Villa Walsh will be augmented, but that consideration is hardly significant in view of the evidence in the record indicating that the surrounding roads are heavily traveled by persons visiting other nearby places including Jockey Hollow

Park which had 427,507 visitors during a stated period of one year. Witness Eugene V. Welsh expressed the opinion that the proposed enlargement of Villa Walsh "would not significantly or to any damaging extent increase the traffic"; he also testified that due "to the topography, the property would have a very limited market for any purpose other than the type that is already there." Another qualified witness, Paul Stirm, expressed the opinion "that it would be very costly, due to the topography of the land, to place one-family residences thereon." Nevertheless, it may be assumed, as the majority opinion suggests, that some of the acreage surrounding Villa Walsh might be divided into building lots and sold for dwelling purposes; but that action would seriously impair the integrity of the institution as it is sought to be operated and would probably harm the area by lessening its general attractiveness. In the light of the foregoing and the entire record in the instant matter, there would appear to be little justification for the majority's conclusion that the municipal officials had no reasonable basis for their determination that the variance could be granted "without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance." *N. J. S. A.* 40:55–39.

No worthwhile educational institution may fairly be expected to continue indefinitely with wholly outmoded facilities and the majority opinion may compel the ultimate abandonment by Villa Walsh of its present site. That result may well disserve the community and the public welfare generally and I find nothing in our law which compels it. Great reliance is apparently placed by the majority on *R. S.* 40:55–48 and the cases thereunder which state that "the spirit of the law is to restrict non-conforming uses." *R. S.* 40:55–48 simply provides that a non-conforming structure or use which existed when the ordinance was passed may be continued. It was intended to insure that such structure or use, no matter how incompatible, may be continued though not enlarged *as of right* and has nothing to do with the *discretionary power* afforded by *N. J. S. A.*

40:55–39(*d*) to grant variances in "particular cases and for special reasons." Such variances may admittedly be granted for the construction of buildings which constitute wholly new uses (*Ward v. Scott, supra*) and *a fortiori* they may be granted for the construction of buildings which simply add to existing uses. Any contrary notion, that paragraph (d) may, under appropriately compelling circumstances, be invoked for a variance permitting the construction of a shopping center or other non-residential building in a restricted zone, but may not, under any circumstances, be invoked for the modernization or enlargement of an existing non-residential building, would entirely lack merit.

I would affirm.

HEHER, J. (dissenting). The lands and structures of Villa Walsh, named in honor of Archbishop Walsh, its founder and patron, constitute a unitary whole devoted to religious and scholastic instruction and training, an educational institution that also includes the training of religious for teaching, a normal school approved and supervised by the New Jersey Department of Education. Such was the use when the zoning ordinance came into being. The Villa is a "teaching community" that provides teachers for the parochial schools in New Jersey. The school children now under the tuition of the school's graduate teachers in New Jersey number 12,000 plus. There is a distinct need for enlarged facilities, not alone to provide more teachers for the ever-increasing enrollment of children in the parochial schools, but largely to supply the means of better trained teachers, a public service of the highest order.

The land comprises 100 acres situate at the intersection of Western Avenue and Pickatinny Road, in Morris Township; it has several buildings used for classrooms, workshops, dormitories, and other school purposes. Such was also the case when the zoning regulation was adopted. The proposed building would provide study and conference rooms, an auditorium, recreation rooms, reception rooms, and other modern facilities for the instruction and training of teachers.

Those now living, teaching and receiving instruction at Villa Walsh are in two groups: professed nuns, of whom 23 are in residence during the Fall, Winter and Spring, and students, 52 in number. The students comprise novices, postulants, and juniors. In recent years the resident nuns and students numbered between 75 and 80 during the Fall, Winter and Spring. In the Summer the number varies from 140 to 150. The nuns return during the Summer for graduate study and training, and the student enrollment is greater. The new building would house the nuns and students now in residence, but in the course of five years there will be 200 nuns and students in residence for teaching and instruction during the Summer months. The need is imperative, it is but fair to say; and if it is not supplied abandonment of the present site, there is reason to believe, would necessarily follow as unsuited to the use to which it is now devoted. The school has no suitable location elsewhere and, even though it had, the removal could not be accomplished without great economic waste.

And the topography at the site of the proposed building would render it of little practical use for one-family residences. The "drop from the roadway to the lowest point of the new building site" is 40 feet; the building "at the front or driveway side would be 2½ stories in height there, and, at the back, due to that slope, the building would be more than 2½ stories from the ground level there." An architect called as a witness by the defendant corporation gave voice to the opinion that it "would be very costly, due to the topography of the land," to use it for one-family residences. And another of its witnesses, a real estate broker of unquestioned competence, corroborated this belief; he testified that, "due to the topography, the property would have a very limited market for any purpose other than the type that is already there"; it "would be totally unfit in its present condition for a one-family residence unless the present buildings, except the former main residence, were torn down"; and in his "opinion the proposed new building would in no way be a deterrent to the erection of one-family residences

on Western Avenue." The new building would be located 500 feet from Pickatinny Road and 1,200 feet from Western Avenue; and, situated as it would be to the rear of the present buildings, it could not be seen from Pickatinny Road, nor would it be visible from Western Avenue.

And in the immediate vicinity of the Villa there is a large armory and the Tufts Dog Kennel.

Thus, there is a substantial basis for the findings of the board of adjustment, these among others: "by reason of its unusual topography and the existence of a large brick mansion, a chapel and two dormitory and classroom buildings," the *locus* "is unsuited for the construction of single family homes unless the present buildings are destroyed, which would be costly and impose severe hardship upon" the Villa; the Villa, "since 1930," in the pursuit of its mission of "educational and religious instruction," "has spent substantial sums of money on improvements including a chapel, school and dormitory buildings, and sewage and water facilities"; the "present buildings are inadequate as facilities for teaching and training teachers and nuns and lack proper amount of living space for the comfort and convenience of those in residence at Villa Walsh"; the Villa "performs a public service in the training of its students and nuns to teach in the parochial schools throughout New Jersey" and in the Township of Morris, "and the training of competent teachers is of increasing importance to, both the State and the community because of the increased number of children both in public and parochial schools"; the proposed building "is needed to provide adequate classrooms, recreational rooms and other accessory facilities and to meet the standards of the Department of Education"; the Villa "requires" the proposed building for the "performance of the purposes and objects for which it was organized and established" and in which it has been "continuously engaged on the premises since 1930"; there are "presently peculiar and exceptional practical difficulties and severe hardships on the applicant as owner of the premises in connection with its already existing use of the premises, which will continue unless the variance

sought is granted"; the granting of the variance "would not affect the present character of the surrounding property," and "would be without substantial detriment to the public good and would not substantially impair the intent and purpose of the Zoning Ordinance," and the requirements of *N. J. S. A.* 40:55–39(*d*) have been met "in that the foregoing findings are special reasons justifying the variance sought."

The township committee approved the recommendation of the variance made by the board of adjustment for the reasons thus given and for the following reasons: "part of said building is to be used for religious purposes, which uses are permitted in the residential zone in which the property is located"; "part of said building is to be used for a school to train teachers for which there is a shortage in New Jersey"; the "topography of said land where the proposed building will be located and the immediate area is not adaptable to the erection of dwellings thereon," and "the most appropriate use of said land can be made by the erection of said building thereon"; "it would not depreciate the value of the land and buildings of the surrounding property"; the "denial of said application would create a hardship for the reasons herein stated"; the granting of said variance will "correct a maladjustment and an inequity in the operation of the general regulations of the zoning ordinance," and "will not substantially impair the intent and purpose of the zoning plan and zoning ordinance."

The Villa's land is in its entirety the subject of a non-conforming use, as an integral part of the religious and educational institution itself, and as such it is within the protection of *R. S.* 40:55–48, securing the continuance of any "non-conforming use or structure" "upon the lot or in the building so occupied." But any structure "may be restored or repaired in the event of partial destruction thereof"; and the holding is that at the very least the new structure would contravene what is said to be the implied limitation of this provision. Under the statute cited *supra,* a non-conforming use may be continued, and the landowner

may restore or repair buildings so used, but he may not "enlarge such use without express permission from appropriate authority." *Sitgreaves v. Board of Adjustment of Town of Nutley*, 136 *N. J. L.* 21, 27 (*Sup. Ct.* 1947); *DeVito v. Pearsall*, 115 *N. J. L.* 323 (*Sup. Ct.* 1935). And to that end the police power is invoked, to vary the application of the general rule for the enlargement of the structures for the selfsame preexisting use, and such is the rationale of the determination now under review.

The variance allowed here is fully defensible under *N. J. S. A.* 40:55–39(*d*), as sustained by "reasons peculiar to the particular piece of land which give it a unique character or status calling for relief to avoid what would otherwise constitute an arbitrary application of the general rule," the minority thesis in *Ward v. Scott*, 16 *N. J.* 16, 27 (1954). And it is equally supportable as within the majority interpretation there of the clause of subdivision (d) permitting a variance "in particular cases and for special reasons." See also *Beirn v. Morris*, 14 *N. J.* 529 (1954). Certainly, the mere extension of the buildings devoted to school uses permissible in the case at hand by the variance thus given is not less in keeping with the constitutional and statutory policy of zoning, and the local regulations in the exercise of the police power to that end, than the construction of a retail shopping center on vacant lands in an exclusively residential zone permitted in *Ward v. Scott*, as "in the public interest" and grantable "without substantial detriment to the public good" and without "substantial impairment" of the "intent and purpose of the zone plan and zoning ordinance." The refusal of leave to expand a non-conforming educational use, serving as it would a need of public concern, is hardly reconcilable with the creation of a non-conforming retail commercial use in a residential zone barred to business uses, especially where, as here, the facilities are devoted in part to permissible religious uses.

It is embedded in our organic law that the landowner's right to the free use and enjoyment of his property, according to his own choice, is subject to reasonable regulation and

212

control by the State in the exercise of the police power; and the inquiry is whether there is a real and substantial relation between the means adopted in a given case and the public health, safety, morals, comfort or convenience, or the general good and welfare, in zoning according to the statutorily enumerated considerations, one or more. *Brandon v. Board of Commissioners of Town of Montclair*, 124 *N. J. L.* 135 (*Sup. Ct.* 1940), affirmed 125 *N. J. L.* 367 (*E. & A.* 1940); *Schmidt v. Board of Adjustment of City of Newark*, 9 *N. J.* 405 (1952). See also *Euclid v. Ambler Realty Co.*, 272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.* 303 (1926).

And it would seem that, by the very nature of the use itself, the enlargement of buildings devoted to school function and service such as we have here is not within the reason and spirit of the non-conforming use provision of *R. S.* 40:55–48. See collation of cases in 36 *A. L. R.* 2d 655. Can it be that our universities within an exclusive residence zone may not expand their building facilities on the campus, as a peremptory limitation upon a non-conforming use? Would not a denial of the extension constitute a wholly unnecessary and unjust invasion of the fundamental right of property? See *Brandon v. Board of Commissioners of Town of Montclair, supra*. The entire tract is within the exemption of the non-conforming use. *De Felice v. Zoning Board of Appeals*, 130 *Conn.* 156, 32 *A.* 2d 635, 147 *A. L. R.* 161 (*Sup. Ct. Err.* 1943). The Villa cannot be denied the lawful use of its land, in the pursuit of its essential function, where there is no discernible legitimate public interest to be served by the use restriction. The burden cannot be in excess of the public need. The principle is basic to constitutional use zoning. A municipality has no power "to prohibit the doing of lawful acts which do not affirmatively appear to serve the public convenience or welfare." *Village of University Heights v. Cleveland Jewish Orphans' Home*, 20 *F.* 2d 743 (6 *Cir.* 1927), 54 *A. L. R.* 1008, *certiorari* denied 275 *U. S.* 569, 48 *S. Ct.* 141, 72 *L. Ed.* 431 (1927). See also *Western Theological Seminary v. City of Evanston*, 325 *Ill.* 511, 156 *N. E.* 778 (*Sup. Ct.* 1927), where a regulation

forbidding the structural expansion of a theological school in a residence "A" district was held to be unreasonable and arbitrary, in that there was no reasonable ground to apprehend that the proposed buildings would menace health, morals, comfort, safety, or general welfare of the community. *Beirn v. Morris, supra,* had an altogether different factual context. The reasonableness of land use control of necessity depends upon the circumstances of the particular case.

And it is fundamental that the judicial authority may not substitute its own independent judgment for the specialized judgment of the agency entrusted by the Legislature with the administrative function, where the findings of the local authority have a substantial basis in the record; and such, I submit, is plainly the case here. *Beirn v. Morris, supra.*

I would affirm.

WILLIAM J. BRENNAN, JR., J., joins in this opinion.

*For reversal*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD and BURLING—4.

*For affirmance*—Justices HEHER, JACOBS and BRENNAN—3.